USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/3/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
SHAWN JACKSON,                                  :
                                                :
                        Plaintiff,              :          **OPINION AND**
                                                :          **ORDER**
        -against-                               :
                                                :          20-CV-7476 (JLC)
KILOLO KIJAKAZI,[1]                             :
Commissioner, Social Security Administration,   :
                                                :
                        Defendant.              :
------------------------------------------------------------------X

---

[1] Kilolo Kijakazi is now the Acting Commissioner of the Social Security
Administration. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo
Kijakazi is substituted for Andrew Saul as the defendant in this action.

# Table of Contents

I.    BACKGROUND ................................................................ 1

   A. Procedural History ................................................1

   B. The Administrative Record ...................................... 3

      1. Jackson's Background ......................................... 3

      2. Relevant Medical Evidence ................................. 4

        a. Treatment History ...................................... 4

          i.  Christopher George, M.D. – Primary Care Physician ........................................ 4

          ii.  Farrah Ashraf, D.O. – Treating Rheumatologist.......6

          iii.  Surinder P. Jindal, M.D., P.C. – Treating

          iv.  Neurologist ...................................7

          v.  Duyet T. Bui, Doctor of Podiatric Medicine (DPM) – Treating Podiatrist ...............................8

          vi.  Brittney Santana, Registered Physician Assistant (RPA) – Treating Provider .....................9

          vii.  Patricia Cave, Doctor of Physical Therapy (DPT) – Treating Physical Therapist ...................10

          viii.  Nurse Practitioner ("NP") June Higgins and Licensed Master Social Worker ("LMSW") Karen Lancaster – Treating Providers .........................11

          ix.  Nurse Practitioner ("NP") Amber Herman and Licensed Master Social Worker ("LMSW") Delilah Gonzalez – Treating Providers ............................12

        b. Opinion Evidence

          i.  Alex Gindes, Ph.D. – Consultative Psychologist..................................... 14

          ii.  Allison Murphy, PM.D. – Consultative Psychiatrist.................................... 15

          iii.  John Caruso, M.D. – Consultative Examiner ........ 15

          iv.  Non-Examining Consultative Opinions ................ 16

      3. ALJ Hearing ................................................. 17

II.   DISCUSSION ............................................................. 21

   A. Legal Standards ................................................ 21

      1. Judicial Review of the Commissioner's Decision .................. 21

      2. Commissioner's Determination of Disability .........................23

        a. Five-Step Inquiry ................................... 24

        b. Duty to Develop the Record ...............................25

        c. Evaluation of Medical Opinion Evidence ......................27

        d.  Claimant's Credibility ……………………………………...…30

**B. The ALJ's Decision** ……………………………………………… **32**

**C. Analysis** ……………………………………………………………… **36**

    1.  The ALJ failed to fully develop the record………….………… 37

    2.  The ALJ did not properly assess medical opinions under
       the new SSA regulations ……………………………….………… 42

    3.  The ALJ's RFC determination was not supported by
       substantial evidence ……………………………………………… 46

    4.  The ALJ's errors were not harmless ……………………………… 48

**III.**    **CONCLUSION** …………………….…………….. ……………….…….....**49**

**JAMES L. COTT, United States Magistrate Judge:**

Plaintiff Shawn Jackson seeks judicial review of a final determination by defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration, denying his application for supplemental security income under the Social Security Act.  Jackson has moved to remand for further administrative proceedings, and the Commissioner has cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, the Court grants Jackson's motion, denies the Commissioner's cross-motion, and remands the case for further proceedings.

## I.  BACKGROUND

### A.  Procedural History

On June 27, 2018, Jackson applied for Supplemental Security Income ("SSI"), alleging a disability onset date of October 1, 2007.[2]  Administrative Record ("AR"), Dkt. No. 11, at 10.[3]  The Social Security Administration ("SSA") denied Jackson's claims on November 2, 2018, and Jackson subsequently filed a request for a hearing before an Administrative Law Judge ("ALJ") on December 12, 2018.  *Id.*  On September 13, 2019, Jackson appeared and testified before ALJ Robert Gonzalez.  *Id.* at 37–77.  Jackson was represented during that hearing by a non-attorney

---

[2] On April 15, 2017, Jackson had filed another SSI application, which was denied in an initial determination on June 15, 2017 and appealed no further.  AR 92, 94.

[3] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

representative, Jessica Lindhorst. *Id.* at 37. Sugi Y. Komarov appeared as
Vocational Expert ("VE"). *Id.* at 10. During that hearing, the ALJ granted a request
by Jackson to amend the alleged onset date to December 28, 2018. *Id.* at 43–44. In a
decision dated December 9, 2019, the ALJ found Jackson to be not disabled and
denied his claim. *Id.* at 7–26. Through his attorney, Jackson sought review of the
ALJ's decision by the Appeals Council on February 1, 2020. *Id.* at 182–85. His
request was denied on July 15, 2020, rendering the ALJ's decision final. *Id.* at 1–3.

Jackson timely commenced this action on September 11, 2020, seeking judicial
review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g) and/or 42
U.S.C. § 1383(c)(3). Complaint ("Compl."), Dkt. No. 1. The Commissioner answered
Jackson's complaint by filing the administrative record on April 1, 2021. Dkt. No. 11.
On July 1, 2021, Jackson moved for remand and submitted a memorandum of law in
support of his motion. Notice of Motion, Dkt. No. 16; Memorandum of Law in
Support of Plaintiff's Motion ("Pl. Mem."), Dkt. No. 17. The Commissioner cross-
moved for judgment on the pleadings on August 31, 2021, and submitted a
memorandum in support of her motion. Notice of Motion, Dkt. No. 20; Memorandum
of Law in Support of the Commissioner's Cross-Motion ("Def. Mem."), Dkt. No. 21.
On September 20, 2021, Jackson submitted reply papers. Reply Memorandum of
Law in Opposition to Defendant's Motion for Judgment on the Pleadings and in
Further Support of Plaintiff's Motion for Remand for Further Administrative
Proceedings ("Pl. Reply"), Dkt. No. 22. The parties have consented to my jurisdiction
for all purposes under 28 U.S.C. § 636(c). Dkt. No. 28.

### B. The Administrative Record

#### 1.        Jackson's Background

Jackson was born on December 20, 1980.  AR at 98.  At the time of the hearing, he was 38 years old and living with his mother in Poughkeepsie.  *Id.* at 56.  Jackson is a father; his son lives with the son's mother.  *Id.*  Jackson has a history of trauma, including witnessing the death of a friend as a result of gunfire in 2001.  *Id.* at 466.  He was arrested twice, in the late 1990's and again in 2003, and struggled with drug and alcohol abuse since he was a young teenager.  *Id.* at 464–68.  In January 2018, Jackson was successfully discharged from rehabilitation at Turning Point treatment facility.  *Id.* at 1028.

Physically, Jackson suffers from polyarthritis, as well as Osgood-Schlatter's disease in both his knees.  *Id.* at 417, 420.  On February 7, 2017, Jackson injured his right foot.  AR at 305.  His left shoulder is a source of pain; he dislocated his shoulder from which he continues to experience pain and was diagnosed with a small Hill-Sachs deformity.  *Id.* at 661–63.  He generally suffers from stiffness and pain in his joints due to these conditions.  Mentally, Jackson was diagnosed with depression, anxiety, and post-traumatic stress disorder ("PTSD").  *Id.* at 477–78.

Jackson received his GED in 2006.  *Id.* at 104.  He had prior temporary work experience as a prep cook and dishwasher.  *Id.* at 48–49.  He was in HVAC training in 2018, but was unable to complete the program due to his injury.  *Id.* at 57.

2.        **Relevant Medical Evidence**

a. **Treatment History**

i.        **Christopher George, M.D. – Primary Care Physician**

Dr. Christopher George began treating Jackson on June 6, 2017 at Hudson River Community Health ("HRCH"). AR at 434. Jackson suffered from joint pain, a shoulder dislocation, arthritis, a fractured ankle, and a toenail fungus infection; he had been taking Omeprazole and Tramadol and was in physical therapy. *Id.*[4] Dr. George observed that Jackson was in "no acute distress," with "normal" range of motion ("ROM") in extremities and "diffuse joint pain." *Id.* Dr. George found that Jackson suffered from gastroesophageal reflux disease ("GERD"). *Id.* at 435.[5] He refilled Omeprazole. *Id.* On September 25, 2017, Dr. George found "diffuse hand, shoulder bilateral and right foot pain," with "no joint crepitation." *Id.* at 430. Jackson also tested ANA positive. *Id.* Dr. George prescribed Prednisone and Meloxicam, and referred Jackson to rheumatologist Dr. Farrah Ashraf. *Id.*[6]

---

[4] Omeprazole is a medication used to treat the symptoms of gastroesophageal reflux disease (GERD). *Omeprazole*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a693050.html (last visited February 28, 2022). Tramadol is a medication used to relieve moderate to moderately severe pain. *Tramadol*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a695011.html (last visited February 28, 2022).

[5] Gastroesophageal reflux disease ("GERD") occurs when stomach acid flows into the tube connecting the mouth and stomach (esophagus). This acid reflux can irritate the lining of the esophagus. Gastroesophageal Reflux Disease (GERD), MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited February 28, 2022).

[6] Prednisone is a medication used to treat the symptoms of low corticosteroid levels, as well as certain types of arthritis and various other conditions. *Prednisone*, U.S.

On January 24, 2018, Jackson returned to Dr. George after his discharge from Turning Point rehabilitation. *Id.* at 424, 1028. He presented with "no acute distress" and "normal ROM" in his extremities, Dr. George noted "perilumbar tenderness, diffuse joint tenderness no swelling" and referred Jackson to Orthopedic Associates for pain in shoulder and foot. *Id.* at 424–25. In a follow-up, Dr. George assessed Jackson with polyarthritis (to be treated by Dr. Ashraf) and onychomycosis (for which he referred Jackson to podiatrist Eric Sims). *Id.* at 420.

When Dr. George examined Jackson on August 17, 2018, he found "limited ROM" in his left shoulder, crepitation to shoulder, right foot pain, and left knee pain and stiffness. *Id.* at 416. Dr. George also noted a "clicking popping sound heard" while examining Jackson's extremities. *Id.* He assessed Jackson as having Osgood-Schlatter's disease in his left knee and "severe persistent" GERD symptoms. *Id.* at 417.[7] Dr. George referred him to Digestive Disease Center, which returned findings to him in a surgical pathology report in September 2018. *Id.* at 417, 579. By February 4, 2019, Dr. George noted "normal ROM" in Jackson's extremities, and that he was in "no acute distress," though suffered from pain to left shoulder, a fractured

---

NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601102.html (last visited February 28, 2022). Meloxicam is a medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Meloxicam*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601242.html (last visited February 28, 2022).

[7] Osgood-Schlatter's disease is a painful swelling of the bump on the upper part of the shinbone, just below the knee. *Osgood-Schlatter*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/001258.htm (last visited February 28, 2022).

right foot, pain with walking, and pain to his right knee. *Id.* at 576. He prescribed more physical therapy. *Id.* On August 2, 2019, Dr. George found "no acute distress," "normal ROM" in the extremities, and no joint tenderness or swelling. *Id.* at 785.

### ii.    Farrah Ashraf, D.O. – Treating Rheumatologist

Dr. Farrah Ashraf of the Premier Medical Group of Hudson Valley first examined Jackson on January 25, 2018, and continued to see him through August 27, 2019. AR at 787–96. At his first assessment, Jackson's spinal contour was normal with full ROM in his upper extremities, but his shoulders had "stiffness bilaterally" with the left greater than the right, and his metatarsophalangeal joints were "tender and swollen bilaterally." *Id.* at 787. Dr. Ashraf suggested Jackson try Daypro and discontinue Meloxicam. *Id.* at 788.[8] On February 16, 2018, Dr. Ashraf noted "full ROM" in both upper and lower extremities, and that "Daypro [was] starting to help." *Id.* at 789. At a May 18, 2018 appointment, Jackson "was doing really well" but his hands and knees were stiff due to biking and exercising. *Id.* at 791. Dr. Ashraf noted mild tenderness in Jackson's upper extremities, and crepitus and stiffness in Jackson's knees, though both had full ROM. *Id.* In December 2018, Jackson reported pain in his left shoulder and right foot to Dr. Ashraf, stating that damp weather caused "severe pain." *Id.* at 793. Dr. Ashraf noted Jackson's right foot was "a little uncomfortable," and his left shoulder had a "decreased" ROM. *Id.*

---

[8] Daypro is the brand name for Oxaprozin, a medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Oxaprozin*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a693002.html (last visited February 28, 2022).

On August 27, 2019, Dr. Ashraf examined Jackson in a follow up appointment. *Id.* at 795. Jackson presented with "worsening" arthritis in the hands, wrists, knees, and shoulders. *Id.* While he had "full ROM" in his upper and lower extremities, Jackson had "stiffness" in his shoulders bilaterally and knees bilaterally, and his wrist and hand joints were "tender." *Id.* Dr. Ashraf ordered blood work and x-rays, and prescribed Relafen for Jackson to take twice a day. *Id.* at 796.[9]

### iii.   Surinder P. Jindal, M.D., P.C. – Treating Neurologist

Jackson saw neurologist Dr. Jindal on August 27, 2018, following a referral from Dr. George. AR at 587. Dr. Jindal noted that Jackson presented with a history of knee pain, shoulder pain, right foot pain, neck and back pain, numbness in the feet and legs, as well as anxiety and depression with insomnia. *Id.* Jackson reported to him that prolonged sitting and standing and certain activity aggravates the symptoms, and his pain was a 7 to 10 on a scale of 10. *Id.* A sleep screen revealed he had "disruptive sleep." *Id.* Dr. Jindal observed Jackson as "[w]ell oriented in person, place, and time." *Id.* Jackson had no aphasia, apraxia or agnosia; his recent and remote memory were intact; and his fund of information, insight, and judgment were appropriate. *Id.* Dr. Jindal prescribed conservative pain management and more

---

[9] Relafen is the brand name for Nabumetone, a medication used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Nabumetone*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a692022.html (last visited February 28, 2022).

testing, as well as Neurontin 100 mg three times a day and Hydrocodone 5 mg, because Jackson "[could not] move around as the pain is 8." *Id.* at 588.[10]

### iv.   Duyet T. Bui, Doctor of Podiatric Medicine (DPM) – Treating Podiatrist

On September 17, 2018, Dr. Duyet Bui at Caremount Medical examined Jackson for right foot pain. *Id.* at 666.  Jackson reported "significant pain," which felt like "deep throbbing." *Id.*  He noted that the pain had been going on for a year due to a fracture of his right foot. *Id.*  Jackson reported having been in a boot for multiple months followed by an ankle brace, and when the foot was "immobilized" and treated conservatively, it got "a little bit better." *Id.*  He reported that despite the symptoms somewhat improving, they "worsened" again. *Id.*  Dr. Bui noted "mild pain at the second and fourth MPJ and metatarsal," "moderate pain on palpation of metatarsocuneiform joint midfoot," "moderate pain within the second webspace," and "moderate to severe pain on palpation of midfoot right along the third MPJ and third metatarsal." *Id.* at 667.  He recommended continuing with anti-inflammatory drugs diclofenac and omeprazole, as well as the 300 mg three times daily of gabapentin he was taking for chronic pain issues. *Id.* at 668.

---

[10] Neurontin is a brand name for Gabapentin, which is used along with other medications to help control certain types of seizures and to relieve the pain of postherpetic neuralgia; when used for those disorders, it decreases abnormal excitement in the brain and changes the way the body senses pain, respectively. *Gabapentin*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a694007.html (last visited February 28, 2022). Hydrocodone is used to relieve severe pain, and is only used to treat people who are expected to need medication to relieve severe pain around-the-clock for a long time and who cannot be treated with other medications or treatments. *Hydrocodone*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a614045.html (last visited February 28, 2022).

Dr. Bui noted "moderate pain" in multiple places of Jackson's right foot during a follow up on April 8, 2019.  *Id.* at 820.  He recommended Jackson take 75mg of Diclofenac twice daily, and start with a course of conservative therapy but return for follow up if there is no improvement.  *Id.* at 821.  Lab tests showed a hallux valgus deformity in Jackson's right foot, though the foot was otherwise "unremarkable."  *Id.* at 822.[11]  During a May 6, 2019 exam, Dr. Bui indicated that Jackson was "not improving."  *Id.* at 818.  He changed Jackson's anti-inflammatory to 500mg of Naprosyn twice daily and delivered a steroid injection.  *Id.*[12]

### v.   Brittney Santana, Registered Physician Assistant (RPA) – Treating Provider

RPA Brittney Santana of CareMount Medical examined Jackson on September 5, 2018.  AR 656–59.  An x-ray of the left shoulder revealed "mild degenerative changes of the acromioclavicular joint."  *Id.* at 658.  RPA Santana ordered an MRI arthrogram of the left shoulder and provided a prescription for Diclofenac.  *Id.*[13]  On September 27, 2018, she again examined and treated Jackson, who arrived with

---

[11] A hallux valgus deformity is a "very common pathological condition which commonly produces painful disability."  Fraissler L, Konrads C, Hoberg M, Rudert M, Walcher M. Treatment of hallux valgus deformity.  EFORT OPEN REV 2016, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5467633 (last visited February 28, 2022).

[12] Naprosyn is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis. *Naprosyn*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a681029.html (last visited February 28, 2022).

[13] Diclofenac is used to relieve mild to moderate pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Diclofenac*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a689002.html (last visited February 28, 2022).

"[p]ersistent shoulder pain." *Id.* at 661.  She performed a left shoulder arthrogram

prior to an MRI, and reported that Jackson had a small Hill-Sachs deformity.  *Id.* at

661–63.  By October 2018, Jackson was experiencing "sharp" shoulder pain at six out

of ten, which decreased with rest; he also described occasional clicking and popping

sensations.  *Id.* at 672.  RPA Santana gave him a Depo-Medrol injection for pain

relief, referred him to physical therapy, and directed him to "avoid heavy lifting."  *Id.*

at 674.  On November 9, 2018, RPA Santana conducted a follow up visit in which

Jackson reported decreased pain in his left shoulder after the Depo-Medrol injection.

*Id.* at 677.  At this visit, RPA Santana prescribed 15 mg of Mobic daily.  *Id.* at 678.[14]

Following physical therapy (see below), Jackson reported to RPA Santana "improved

range of motion and strength of the shoulder," with "mild infrequent pain."  *Id.* at

695.  He then reported "minimal pain" on May 22, 2019.  *Id.* at 806.

### vi.   Patricia Cave, Doctor of Physical Therapy (DPT) – Treating Physical Therapist

Jackson saw Dr. Patricia Cave at CareMount for a physical therapy evaluation

on February 26, 2019.  AR at 680.  Jackson reported that he "[couldn't] lift anything

heavy," "ha[d] pain when he elevate[d] the arm," and his left shoulder pain "ma[de]

sleeping on his side difficult."  *Id.*  He noted that his foot hurt at a five out of ten level

from time to time, "associated with increased walking."  His Neurontin prescription

"help[ed] somewhat" with pain.  *Id.*  Dr. Cave directed physical therapy, twice a week

---

[14] Mobic is a brand name for the medication Meloxicam, which is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. *Meloxicam*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a601242.html (last visited February 28, 2022).

for six weeks, involving exercise, electrical stimulation, and heat to increase

flexibility and strength, and decrease pain and muscular tightness.  *Id.* at 682.

During his next session on March 5, 2019, Jackson reported "clicking" in his left

shoulder which could be painful, and Dr. Cave discussed a "slightly reduced range of

exercises" to avoid the clicking.  *Id.* at 686.  In follow up sessions on March 7 and 14,

Jackson reported both "gradual progress," and "left shoulder pops," respectively.  *Id.*

at 689, 692.  Dr. Cave noted that he "tolerated treatment well."  *Id.* at 693.

> ### vii.   Nurse Practitioner ("NP") June Higgins and
> ### Licensed Master Social Worker ("LMSW")
> ### Karen Lancaster – Treating Providers

Hudson Valley Mental Health ("HVMH") practitioner LMSW Karen Lancaster

completed a psychosocial assessment of Jackson on January 28, 2018.  AR at 464–80.

Jackson was "preoccupied" with the loss of friends and family in his life, and noted he

had "residual guilt" over them.  *Id.* at 464, 475.  He presented with "mild anxiety and

mild depression," "feeling on edge," "excessive/intrusive worry," "trouble relaxing,"

"sleep disturbances," "anhedonia," "feeling depressed," "low mood," and "fatigue."  *Id.*

Lancaster found Jackson's insight and judgment to be "fair," and his intellectual

functioning "average."  *Id.* at 475–76.  Jackson's diagnoses included "major

depressive disorder, recurrent episode, mild; PTSD; alcohol use disorder, mild;

cannabis use disorder, severe; phencyclidine use disorder, severe; tobacco use

disorder, severe."  *Id.* at 477–78.  Lancaster assessed that he could benefit from

medication management.  *Id.* at 479.  He was placed on a treatment plan in March

2018.  *Id.* at 487–89.  During a psychiatric assessment of Jackson on April 12, 2018,

NP June Higgins assessed his affect as "blunted," conversational skills as "mildly

impaired," and concentration, memory, insight, and judgment as "adequate" for the interview and to participate in the treatment decision.  *Id*. at 481.  She started him on Inderal LA 80 mg and Lamical 25 mg.  *Id*. at 482.[15]

### viii.   Nurse Practitioner ("NP") Amber Herman and Licensed Master Social Worker ("LMSW") Delilah Gonzalez – Treating Providers

At Family Services, Inc., psychiatric NP Amber Herman completed a new client psychiatric assessment of Jackson on April 4, 2019.  AR at 413–23.[16]  His diagnoses included major depressive disorder, recurrent episode, mild; PTSD; cannabis use disorder, severe; alcohol use disorder, mild; tobacco use disorder, moderate.  *Id*. at 720–21.  Jackson was taking 200 mg of Lamical "sporadically," *id*. at 723, and felt his medication worked well.  *Id*. at 715.  He denied a history of past trauma or abuse, or symptoms of PTSD, depression, and anxiety.  *Id*.  His memory, orientation, and concentration were "intact," and insight and judgment were checked off as "limited," *id*. at 719, but described as "good."  *Id*. at 723.  NP Herman decreased his Lamical dose to 100 mg and encouraged him to take it daily.  *Id*.  LMSW

---

[15] Lamical is a brand name for the medication Lamotrigine, which is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar I disorder.  *Lamotrigine*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a695007.html (last visited February 28, 2022).  Inderal LA is a brand name for the medication Propranolol, which is used to treat a variety of heart conditions.  *Propranolol*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/druginfo/meds/a682607.html (last visited February 28, 2022).

[16] Family Services, Inc. and HVMH merged in April 2019.  *See* Doyle, Brian, "A Note from our CEO," FAMILY SERVICES NEWSLETTER, https://familyservicesny.org/author/familyservices/ (last accessed February 28, 2022).  Gonzalez appears on HVMH forms in March 2019.  AR at 704–05.

Gonzalez also met with Jackson in 2019.  *Id.* at 724, 740.  On August 7, 2019,

Jackson was optimistic and stated that aspects of his life were starting to "[fall] into

place."  *Id.* at 728.  Gonzalez encouraged him to be more active in his community.  *Id.*

        In a medical questionnaire dated September 10, 2019, NP Herman noted that

she had been seeing Jackson "once to twice a month for individual therapy, and once

to twice a month for medication management."  AR at 778–83.  In her report, NP

Herman responded "none or mild" to all of the questions relating to Jackson's

functional limitations.  *Id.* at 782.  Based on her examination, NP Herman indicated

that Jackson was "unable to meet competitive standards" in seven out of sixteen

categories of work-related activities, including: 1) maintain attention for two hour

segment; 2) maintain regular attendance and be punctual within customary, usually

strict tolerance; 3) sustain an ordinary routine without special supervision; 4) work in

coordination with or proximity to others without being unduly distracted; 5) perform

at a consistent pace without an unreasonable number and length of rest periods; 6)

accept instructions and respond appropriately to criticism from supervisors; and 7)

deal with normal work stress.  *Id.* at 780.  Of the remaining nine categories of work-

related activities, NP Herman indicated that Jackson was "seriously limited but not

precluded from" seven, including: 1) remember work-like procedures; 2) make simple

work-related decisions; 3) complete a normal workday and work week without

interruptions from psychologically based symptoms; 4) ask simple questions or

request assistance; 5) get along with coworkers or peers without unduly distracting

them or exhibiting behavioral extremes; 6) respond appropriately to changes in a

routine work setting; and 7) be aware of normal hazards and take appropriate

precautions. *Id*. NP Herman explained these limitations based on Jackson's "report [of] becoming easily distracted, [having] trouble focusing [and] maintaining a routine." *Id*. She further opined that Jackson's impairments would cause him to be absent form work "about three days per month." *Id*.

### b. Opinion Evidence

### i. Alex Gindes, Ph.D. – Consultative Psychologist

On June 8, 2017, Dr. Alex Gindes conducted a psychiatric evaluation of Jackson. AR 371–75. Dr. Gindes found that Jackson's social skills "seemed fair," while he related in a "very subdued and somewhat helpless manner." AR at 372. Dr. Gindes opined that Jackson was "markedly limited" in his abilities to: use reason and judgment to make work-related decisions; interact adequately with supervisors, co-workers, and the public; sustain ordinary routine and regular attendance at work; and regulate emotions, control behavior, and maintain well-being. AR 374–75. Dr. Gindes found Jackson's ability to concentrate and perform a task at a consistent pace to be "extremely limited." *Id*. at 373. He noted impairments in Jackson's recent and remote memory skills, and attention and concentration. Dr. Gindes found Jackson was able to dress, bathe, and groom himself, as well as cook, clean, do laundry, and take public transportation. *Id*. Dr. Gindes concluded that the results of his exam appeared "consistent with psychiatric and cognitive problems that may significantly interfere with [Jackson's] ability to function on a daily basis." *Id*. at 374.

### ii.   Allison Murphy, PM.D. – Consultative Psychiatrist

Dr. Allison Murphy conducted a psychiatric evaluation of Jackson on October 11, 2018.  AR at 451–55.  Dr. Murphy found "no evidence of limitation" in Jackson's ability to: "understand, remember, or apply simple directions and instructions; and maintain personal hygiene and appropriate attire; be aware of normal hazards and take appropriate precautions."  *Id.* at 454.  She found "mild" impairments in Jackson's attention and concentration, recent and remote memory skills, as well as "mild limitations" in Jackson's abilities to: use reason and judgment to make work-related decisions, sustain concentration and perform tasks at a consistent pace, and sustain ordinary routine and regular attendance at work.  *Id.*  Dr. Murphy found "moderate" limitations in Jackson's ability to interact appropriately with supervisors, co-workers, and the public, as well as his ability to regulate emotions, control behavior, and maintain well-being.  *Id.*  She opined that the results of the evaluation were consistent with psychiatric and substance abuse problems that would "significantly interfere" with Jackson's ability to function on a daily basis, and his expected duration for treatment would be more than one year.  *Id.* at 455.

### iii.   John Caruso, M.D. – Consultative Examiner

On October 11, 2018, Dr. John Caruso conducted an internal medicine examination of Jackson.  AR at 455–61.  Jackson reported that his shoulder pain was ten out of ten on a bad day, his joint pain ranged from a zero to a ten out of ten, his knee pain ranged from five to a nine out of ten, and his foot pain ranged from eight and a ten out of ten.  *Id.* at 455–56.  While the pain caused by Osgood-Schlatter

disease in his knees "improved with activity," the pain caused by his shoulder injury was "exacerbated . . . by activity." *Id.*  Dr. Caruso noted that Jackson was able to dress, bathe, and groom himself, as well as cook, clean, do laundry, and take public transportation. *Id.* at 457.  Jackson wore an assistive device, which Dr. Caruso found to "appear useful" but questioned if it was "truly medically necessary." *Id.* at 458.

In his medical source statement, he found Jackson had "mild limitations" in his ability to squat, rise from a chair, and kneel, as well as "mild to moderate limitations" lifting and carrying heavier objects. *Id.* at 460–61.  Dr. Caruso previously conducted a consultative examination of Jackson on June 8, 2017. *Id.* at 376–383.  He reported that Jackson's "gait was wide," and that Jackson walked "from heel to toe as if he were rolling his foot from backward to forward." *Id.* at 378.  At that time, he found Jackson did not "demonstrate any significant limitations" in overall strength or ROM. *Id.* at 380.

### iv.   Non-Examining Consultative Opinions

On November 1, 2018, state agency medical consultant Dr. A. Auerbach and state agency psychological consultant Dr. S. Hennessey completed assessments regarding Jackson's physical and mental limitations based on their review of Jackson's medical records.  AR at 94–105.[17]  Dr. Auerbach reported that while Jackson's exams demonstrated crepitus with ROM of the knees and some tenderness

---

[17] The spelling of Dr. Hennessey's name is unclear in the record before the Court. The electronic signatures on his assessment form are spelled "Hennessey," while the ALJ uses both "Hennessey" and "Hennessy" interchangeably. *Id.* at 24, 99, 105.  The parties use the spelling "Hennessy" in their papers. *See, e.g.* Pl. Mem. at 20; Def. Mem. at 2.  The Court will adopt the spelling used in his assessment form in this opinion.

of the MTPs and MCP joints, all his rheumatologic testing is normal. *Id.* at 102. Further, at his consultative exam, Jackson had normal gait, could walk on heels/toes without difficulty, and had full sensation and strength, dexterity, and grip. *Id.* Dr. Auerbach concluded that Jackson was capable of light work, as he was independent with activities of daily living, capable of light cleaning and playing outside with his son, and his joint complaints were "doing well" until he began "exercising a lot and biking." *Id.* at 101–02.

Dr. Hennessey concluded that the record supported the presence of a "severe psychiatric impairment that results in more than minimal functional limitations." *Id.* at 105. However, he also found the following: 1) Jackson was able to understand and remember simple, and some more detailed instructions and work procedures; 2) Jackson possessed the concentration and persistence necessary to complete simple, and some more detailed, tasks consistently on a sustained basis; 3) Jackson was able to respond to supervisors and coworkers appropriately; and 4) Jackson had "no substantial limitation" in his ability to adapt to customary changes in an ordinary work environment. *Id.*

### 3. ALJ Hearing

On September 13, 2019, Jackson appeared before the ALJ. *Id.* at 37. In a pre-hearing letter dated September 6, 2019, his representative argued that Jackson has the following impairments: PTSD, depression, anxiety, left shoulder impairment, right foot impairment, and arthritis. *Id.* at 277. She specifically cited the clinical treatment notes of Dr. Jindal from 2018 and Dr. George from 2019 to describe Jackson's shoulder, knee, foot, and back pain as well as GERD, PTSD, anxiety,

depression, and insomnia.  *Id.*  She also specifically cited Dr. Gindes' 2017

examination, which found that due to depression and cognitive deficits, Jackson was

"extremely limited" in his ability to "sustain concentration and perform a task at a

consistent pace," as well as "markedly limited" in his "ability to understand,

remember and apply complex direction and instructions; use reason and judgment to

make work related decisions and interact adequately with supervisors and coworkers

and the public; ability to sustain [an] ordinary routine and regular attendance at

work, regulate emotions, control behavior and maintain well being."  *Id.*

Finally, Jackson's representative noted in the pre-hearing letter that records

were requested but not yet received by a number of treatment facilities; at the time of

the hearing, records were still outstanding from Hudson River Health Care, Turning

Point Rehabilitation, and Dr. Ashraf.  *Id.* at 278, 40.  Following some confusion at

the hearing regarding whether all the relevant paperwork had been completed and

submitted, the ALJ concluded the discussion by stating: "[i]f there's anything else

that's outstanding regarding your disability you can speak with [your representative]

about it and then she'll be able to contact our office and provide it if it's relevant to

your claim for disability."  *Id.* at 48.

At the time of the hearing, Jackson was living with his mother.  *Id.* at 56.  He

testified that he had a son who was living with his son's mother.  *Id.*  He was free and

clear of any substance abuse since leaving Turning Point.  *Id.* at 68.  Jackson

described how in his spare time he was "always in the community" as a volunteer

helping kids play basketball, but not in an official capacity – rather, he would just

show up where he knew the kids to be playing.  *Id.* at 53, 66.

With respect to his impairments, Jackson testified that he dislocated his shoulder years ago, suffers from arthritis, and broke his foot around July 2017 while playing basketball. *Id.* at 56–57. He described himself as being unable to sleep, "always anxious," and "depressed." *Id.* at 64. Jackson reported that at the time of the hearing he had just started new medication for his arthritis, and that his doctor has recently "upped" his medication. *Id.* at 66–67. He testified that it was "real hard" to sit, "very hard" for him to go back and forth between standing and sitting, and that he couldn't sleep because of stiffness in his body when he would lie down. *Id.* at 62–63. He described an hour as "way too long" for him to be standing or walking at one time. *Id.* at 63. Jackson further testified that he was "always on [his] bike," because he is exercising as a way to try to "build [himself] back up," but his shoulder was "always hurting." *Id.* at 59–61. On video at the hearing, Jackson lifted his left arm above his head, which caused a cracking noise. *Id.* at 61. The ALJ characterized this as "full extension" of Jackson's left arm above his head, to which Jackson responded by describing how weak it was. *Id.* at 61–62.

Jackson testified that in the 15 years prior to the hearing, he had been employed on two occasions by Omega Institute for Holistic Studies. *Id.* The first six-month employment was as a dishwasher, and the second six-month employment was in 2007 as a prep cook and dishwasher. *Id.* at 48–49. When the ALJ asked why Jackson did not work between 2004 and 2018 with the exception of those roles, Jackson responded that his felony conviction from 2003 kept coming up on background checks and he would be denied jobs. *Id.* at 50–51. He testified that he did HVAC training "sometime last year [in 2018]." *Id.* at 52. Jackson failed three

modules "due to the [foot] injury and stuff like that," as he was missing days at school. *Id.* at 57. He was not looking for work anymore because he was "trying to get [his] life together . . . [he] can't even focus on getting one thing done." *Id.* at 55.

The ALJ next questioned VE Sugi Komarov. *Id.* at 71–74. Komarov explained that Jackson's past work experience would be classified as a composite job of kitchen helper and short order cook. *Id.* at 71. The ALJ then described a hypothetical individual of Jackson's demographics with a Residual Functional Capacity ("RFC") to engage in a full range of light exertional work, who can: frequently reach in all directions with the left upper extremity; frequently stoop and crouch; can understand, remember, and carry out simple work; adapt to routine workplace changes; and can occasionally interact with supervisors, coworkers, and the general public; but who cannot work at unprotected heights. *Id.* at 71–72. Komarov concluded that, based on these conditions, this hypothetical individual would be able to perform Jackson's past work and there would be three other jobs in the national economy such a person would be able to perform, including marker, mail clerk, and photocopying machine operator. *Id.* at 72.

The ALJ then described an individual of Jackson's demographics with an RFC to engage in a full range of sedentary exertional work, who can: frequently reach in all directions with the left upper extremity; frequently stoop and crouch; can understand, remember, and carry out simple work; adapt to routine workplace changes; and can occasionally interact with supervisors, coworkers, and the general public; but who cannot work at unprotected heights. *Id.* at 72–73. Komarov testified that such an individual would not be able to perform any of Jackson's past work, but

20

would be able to perform the jobs of semiconductor (bonder), addresser, and layout taper. *Id.* at 73. Komarov further testified that if a person were to be "off task" for 15 percent or more of the workday, "one would not be able to maintain employment." *Id.* Komarov testified that if a person was absent from work three days a month due to their impairments, that person would not be able to maintain employment. *Id.* at 74. Komarov concluded that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and the Selected Characteristics of Occupations ("SCO"); however, those sources do not address being off task and absenteeism, so those assessments were based on her experience, education, and training. *Id.*

## II.   DISCUSSION

### A. Legal Standards

#### 1.   Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether the decision is supported by "substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("Under the substantial-evidence standard, a court looks to an existing

administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938))).

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (*quoting Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence."

*Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2.       Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022). Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Id.* (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill,* 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).  If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id*.; 20 C.F.R. § 404.1520(d).  If not, the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

If the claimant alleges a mental impairment, the Commissioner must apply a "special technique" to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three.  *See* 20 C.F.R §§ 404.1520a, 416.920a; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008).  "If the claimant is found to have a 'medically

24

determinable mental impairment,' the [Commissioner] must 'specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s),' then 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a],' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL 4392986, at *18 (S.D.N.Y. Sept. 24, 2021) (quoting 20 C.F.R. §§ 404.1520a(b), (c)(3); *id.* §§ 416.920a(b), (c)(3)). "The functional limitations for these first four areas are rated on a five-point scale of none, mild, moderate, marked, or extreme, and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of none, one or two, three, or four or more." *Id.* (cleaned up).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks omitted). As part

of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law." (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999))). The ALJ must develop the record even where the claimant has legal counsel. *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). Remand is appropriate where this duty is not discharged. *See, e.g., Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by

substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation marks omitted). For SSI and SSDI applications filed prior to March 27, 2017, SSA regulations set forth the "treating physician rule," which required an ALJ to give more weight to the opinions of physicians with the most significant clinical relationship with the plaintiff. 20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2); *see also, e.g.*, *Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004). Under the treating physician rule, an ALJ was required to give "good reasons," 20 C.F.R. § 404.1527(c)(2), if she determined that a treating physician's opinion was not entitled to "controlling weight," or at least "more weight," than the opinions of non-treating and non-examining sources. *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000). In addition, a consultative physician's opinion was generally entitled to "little weight." *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the evaluation of medical opinion for claims filed on or after March 27, 2017 (such as Jackson's claim in this case). *See* REVISIONS TO THE RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017). "In implementing new regulations, the SSA has apparently sought to move away from a

perceived hierarchy of medical sources." *Velasquez*, 2021 WL 4392986, at *19 (citing

82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give

any specific evidentiary weight, including controlling weight, to any medical

opinion(s) or prior administrative medical finding(s), including those from [a

claimant's] medical sources." *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)).

"Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their

persuasiveness' based on the following five 'factors': (1) supportability, (2)

consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other'

factor that 'tend[s] to support or contradict a medical opinion.'"  *Id.* (quoting 20 C.F.R.

§§ 404.1520c(a)–(c), 416 920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's

duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b),

416 920c(a)–(b).  Under the new regulations, the ALJ must "explain how [she]

considered" both the supportability and consistency factors, as they are "the most

important factors."  20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g., Amber*

*H. v. Saul*, No. 20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021)

(two "most important factors for determining the persuasiveness of medical opinions

are consistency and supportability," which are the "same factors" that formed

foundation of treating physician rule).  With respect to the supportability factor, "the

strength of a medical opinion increases as the relevance of the objective medical

evidence and explanations presented by the medical source increase."  *Vellone v.*

*Saul*, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021)

(citing 20 C.F.R. §§ 404 1520c(c)(1), 416.920c(c)(1)), *adopted sub nom. Vellone on*

28

*behalf of Vellone v. Saul*, No. 20-CV-261 (RA), 2021 WL 2891138 (July 6, 2021).

Consistency, on the other hand, "is an all-encompassing inquiry focused on how well

a medical source is supported, or not supported, by the entire record." *Id.* (citing 20

C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)); *see generally* 42 U.S.C. § 423(d)(5)(B)

(requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but

need not explicitly discuss, the three remaining factors (relationship with the

claimant, specialization, and other factors tending to support or contradict a medical

opinion). *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Where, however, the ALJ

has found two or more medical opinions to be equally supported and consistent with

the record, but not exactly the same, the ALJ must articulate how [she] considered

those three remaining factors." *Velasquez*, 2021 WL 4392986, at *20 (citing 20 C.F.R.

§§ 404.1520c(b)(3), 416.920c(b)(3)).

Courts considering the application of the new regulations have concluded that

"the factors are very similar to the analysis under the old [treating physician] rule."

*Id.* (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta*

*Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (KMW) (KHP), 2021 WL 363682, at *9

(S.D.N.Y. Jan. 29, 2021) (report and recommendation) (collecting cases considering

new regulations and concluding that "the essence" of the treating physician rule

"remains the same, and the factors to be considered in weighing the various medical

opinions in a given claimant's medical history are substantially similar"). "This is

not surprising considering that, under the old rule, an ALJ had to determine whether

a treating physician's opinion was *supported* by well-accepted medical evidence and

29

*not inconsistent* with the rest of the record before controlling weight could be assigned." *Acosta Cuevas*, 2021 WL 363682, at \*9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at \*5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718 (FPG), 2021 WL 856909, at \*5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide discussion of supportability and consistency of two medical opinions and explaining that ALJ may not merely state that examining physician's opinion is inconsistent with overall medical evidence).

Importantly, "an ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d at 265). However, the Court need not remand the case if the ALJ only committed harmless error*, i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at \*6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's

finding of credibility "must . . . be set forth with sufficient specificity to permit

intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal

quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir.

1988)). "The ALJ must make this [credibility] determination 'in light of the objective

medical evidence and other evidence regarding the true extent of the alleged

symptoms.'" *Id.* (*quoting Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other

symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d

Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step

framework for evaluating allegations of pain and other limitations. *Id.* First, the

ALJ considers whether the claimant suffers from a "medically determinable

impairment that could reasonably be expected to produce" the symptoms alleged. *Id.*

(citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an

impairment, at the second step, the ALJ must consider 'the extent to which [the

claimant's] symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)).

Among the kinds of evidence that the ALJ must consider (in addition to objective

medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location,
> duration, frequency, and intensity of the individual's
> pain or other symptoms; 3. [f]actors that precipitate and
> aggravate the symptoms; 4. [t]he type, dosage,
> effectiveness, and side effects of any medication the
> individual takes or has taken to alleviate pain or other
> symptoms; 5. [t]reatment, other than medication, the
> individual receives or has received for relief of pain or
> other symptoms; 6. [a]ny measures other than

> treatment the individual uses or has used to relieve
> pain or other symptoms (e.g., lying flat on his back,
> standing for 15 to 20 minutes every hour, or sleeping on
> a board); and 7. [a]ny other factors concerning the
> individual's functional limitations and restrictions due
> to pain or other symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. The ALJ's Decision

On December 9, 2019, in a 17-page decision, the ALJ found that Jackson was not disabled based on the application for SSI filed on June 27, 2018 with an amended alleged onset date of December 28, 2018. AR at 26. At step one of the five-step inquiry, the ALJ found that Jackson had no earnings or work activity from the amended alleged onset date of December 28, 2018 through the date last insured, and therefore Jackson had not engaged in substantial gainful activity. *Id*. at 12–13. At step two, the ALJ found that Jackson had the following severe impairments: PTSD, depression, anxiety, attention deficit disorder, left shoulder impingement, Osgood-Schlatter disease in the bilateral knees, polyarthritis, obesity, status post closed displaced fracture of the fifth metatarsal bone in the right foot, peroneal tendinitis of the right lower extremity. *Id*. at 13. At step three, after considering Jackson's impairments under "several listings," the ALJ found that Jackson did not have "an impairment or combination of impairments" that met the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.[18]

---

[18] In his analysis, the ALJ considered Jackson's physical impairments as well as his mental impairments. Jackson's physical impairments did not "satisfy the requisite neurological, clinical, and/ or diagnostic requirements" of Listings 1.02 and 14.09. *Id.*

Prior to evaluating step four, the ALJ determined Jackson's RFC.  In making this finding, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence . . . [including] medical opinion(s) and prior administrative medical finding(s) . . ."  *Id.*  The ALJ found that although Jackson's "medically determinable impairments could reasonably be expected to cause the alleged symptoms;" the alleged "intensity, persistence and limiting effects of these symptoms" were "not entirely consistent" with the evidence in the record.  *Id.* at 17.

To reach that finding, the ALJ first summarized and assessed clinical treatment notes from January 2018 through August 2019.  *Id.* at 17–23.  The ALJ described Jackson's physical treatment notes concerning his obesity, shoulder impingement, foot pain, Osgood-Schlatter's disease, polyarthritis, and right knee pain.  *Id.* at 17–20.  After providing a factual summary of Jackson's treatment notes, the ALJ concluded that despite "some positive findings on imaging and exam," they are "described as mild to moderate throughout the record."  *Id.* at 22.  The ALJ noted he had "intact motor, gait, sensory, and reflex findings" as well as "routine and conservative care" with "no recommendations for increase[d] measures of pain

_____

at 13.  The ALJ then determined that the "severity" of Jackson's mental impairments "considered singly and in combination" do not meet or medically equal the criteria of the relevant listings.  *Id.* at 14.  The ALJ noted that although Jackson had three "moderate" impairments and one "mild" impairment, he did not have at least two "marked" limitations or one "extreme" limitation as required to satisfy the "paragraph B" criteria.  *Id.* at 14–16.  Finally, the ALJ additionally considered whether "paragraph C" criteria were satisfied.  He found that because the evidence did not show that Jackson had "minimal capacity to adapt to changes in his environment or to demands that are not already part of his daily life," he did not meet the second prong of "paragraph C" requirements.  *Id.* at 16.

management," hospitalizations related to Jackson's physical impairments, or surgical intervention.  *Id.*  The ALJ also reviewed Jackson's mental impairments – including PTSD, ADHD, anxiety, and depression – again summarizing clinical notes.  *Id.* at 20–21.  After providing a summary of Jackson's treatment notes, the ALJ concluded that Jackson's mental health impairments were "severe" and required "ongoing treatment," but that he benefited from treatment and his limitations only ranged from mild to moderate in nature with no marked or extreme limitations in the domains of mental functioning.  *Id.* at 21.

Given those assessments, the ALJ then considered Jackson's subjective statements.  He found that Jackson had described daily activities which are not limited "to the extent one would expect, given the complaints of disabling symptoms and limitations."  These included that although his mother does most of the cooking, Jackson is able to "clean twice a week, do laundry once a week, and [shop] once a week" as well as shower or bathe, dress himself, watch TV, listen to the radio, socialize with friends, and help coach and instruct children playing basketball.  *Id.* at 21–22.  The ALJ further found that "the record shows a lack of reduced joint motion, muscle spasm, sensory deficit, and motor disruption" associated with "the symptom of pain and testimony regarding functional limitations."  *Id.* at 22.

Next, the ALJ assessed the medical opinion evidence.  *Id.* at 23–24.  The ALJ first considered the October 2018 opinion of psychological consultative examiner Dr. Murphy, who reported that Jackson had only mild to moderate limitations.  *Id.* at 23.  The ALJ found this opinion "persuasive" because it was "internally consistent with [her] examination [as well as] other findings throughout the record."  *Id.*  The ALJ

34

then considered the October 2018 opinion of internal medicine consultative examiner Dr. Caruso, who reported Jackson demonstrated mild to moderate limitations lifting and carrying heavier objects but no significant limitations in overall strength or dexterity in the hands. *Id.* He likewise found this opinion "persuasive" as it was consistent with Jackson's reports during the exam, the findings of other exams throughout the longitudinal records, and "the limitations are proportionate to the objective findings from this exam." *Id.*

The ALJ then found the November 2018 assessments by state agency consultants Drs. Hennessey and Auerbach to be "persuasive." *Id* at 24. Dr. Hennessey's opinion was "consistent and supported by the mental status examinations throughout the record," and although Dr. Auerbach opined that Jackson was capable of light work while the ALJ provided for limitations to a range of sedentary work, his opinion was persuasive "in that the claimant has a wide array of daily living activities and a high level of independence in his personal functioning." *Id.* Finally, the ALJ considered the September 2019 opinion of treating nurse practitioner Herman, who opined that Jackson was "unable to meet competitive standards." *Id.* He found this opinion "not persuasive" because it was "not well supported by the DDS opinions or by treatment reports [of Dr. Ashraf]." *Id.*

Based on this analysis, the ALJ found that Jackson could perform sedentary work as defined in 20 C.F.R. § 416.967(a) except that he could frequently reach with the left upper extremity, frequently stoop and crouch; understand, remember, and carry out simple work; adapt to routine workplace changes and could occasionally

interact with supervisors, coworkers, and the general public; and should avoid working at unprotected heights. *Id.* at 16.

At step four, the ALJ found that Jackson was unable to perform any past relevant work. *Id.* at 24. At step five, after considering Jackson's demographics and RFC, as well as the VE's testimony, the ALJ concluded that there were jobs that exist in significant numbers in the national economy that Jackson could perform, such as semi-conductor bonder, addresser, and circuit layout paper. *Id.* at 25–26. Accordingly, the ALJ concluded that Jackson had not been under a disability since the amended alleged onset date of December 28, 2018. *Id.* at 26.

### C. Analysis

Jackson argues that this case should be remanded because: (1) the amended alleged onset date used was incorrect; (2) the ALJ did not correctly assess the medical and non-medical evidence; (3) the RFC finding was not supported by substantial evidence; and (4) Jackson was not capable of the sedentary jobs set forth by the VE. Pl. Mem. at 2, 19, 21, 23.[19] The Commissioner counters that the ALJ properly

---

[19] Jackson argues in a footnote in his memorandum that the amended alleged onset date of December 28, 2018 is erroneous, despite the assertion of that date in both his counsel's pre-hearing letter and Jackson's hearing testimony. Pl. Mem. at 2, n. 2, AR at 43–44, 244. This amended onset date was chosen because it was purportedly the date on which Jackson turned himself into Turning Point for rehabilitation. *Id.* at 43–44. The ALJ accepted the amended onset date at the hearing, and in his written decision claimed he "addresse[d] [Jackson]'s allegation of disability under Title XVI from December 28, 2018 forward." *Id.* at 10, 44. Medical records, however, demonstrate that Jackson turned himself into Turning Point the year prior to the year asserted during his testimony, on December 28, 2017 (not 2018), and likewise he was discharged on January 11, 2018 (not 2019). *See, e.g., id.* at 1026–28. In his decision, while the ALJ accepted the amended date, he also recognized December 2017 as the correct month in which Jackson turned himself into Turning Point, and acknowledged that he was discharged in January 2018. AR at 10, 20.

evaluated the evidence, that the RFC determination was supported by substantial evidence, and that Jackson could perform work that exists in significant numbers in the national economy.  Def. Mem. at 15, 22, 32.  For the reasons that follow, I remand the case to the ALJ for further proceedings.

### 1.    The ALJ failed to fully develop the record

As a preliminary matter, the ALJ failed to fully develop the record regarding Jackson's physical impairments. Because the ALJ's duty to develop the record on behalf of a claimant is a threshold duty, "[r]emand is appropriate when the ALJ fails to discharge this duty." *Acosta Cuevas*, 2021 WL 363682, at *10.  The only functional assessments in Jackson's medical record regarding his physical impairments were completed by consulting examiners, despite extensive medical records provided from a number of his longtime treating physicians.  There are no functional assessments with respect to Jackson's physical impairments, despite lengthy treatment records

---

"It is generally inappropriate to make substantive arguments in footnotes." *In re MF Global Holdings Ltd. Inv. Litig.*, No. 11-CV-7866 (VM), 2014 WL 8184606, at *2 (S.D.N.Y. Mar. 11, 2014).  Courts in this Circuit have made clear that arguments in footnotes are waived. *See Skibniewski v. Commissioner*, No. 19-CV-506 (JGW), 2020 WL 5425343, at *3, n.1 (W.D.N.Y. Sept. 10, 2020) (collecting cases).  Moreover, while "[m]edical evidence that predates the alleged disability onset date is ordinarily not relevant to evaluating a claimant's disability," the ALJ did in fact consider evidence prior to December 2018. *Carway v. Colvin*, 13-CV-2431 (SAS), 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014).  He addressed medical treatment notes beginning in January 2018, as well as opinions from October and November 2018 – prior to the purportedly "erroneous" alleged onset date.  AR at 17–24.  The Court therefore rejects Jackson's request that the case be remanded "for clarification of this [onset date] issue alone."  Pl. Mem. at 2.  Notably, Jackson does not propose a corrected onset date, whether December 28, 2017 or otherwise.  However, because the Court is remanding the case on other grounds, the ALJ will be directed to clarify the amended alleged onset date – and therefore the relevant time period – given the record of his treatment at Turning Point.

from Dr. George, Dr. Ashraf, Dr. Jindal, Dr. Bui, RPA Santana, and Dr. Cave. Furthermore, the consultative examinations were completed in October and November 2018, almost a year before the hearing, and thus predate further issues, such as the worsening of arthritis.  The only functional assessment provided by a treating source that the ALJ considered was the mental impairment medical questionnaire provided by NP Herman on September 10, 2019; it was summarily dismissed it as "unpersuasive."  AR at 24.

An ALJ must make "every reasonable effort" to obtain from an individual's treating health care provider all medical evidence necessary to properly make a disability determination.  *Starr v. Comm'r of Soc. Sec.*, No. 20-CV-4484 (GWG), 2022 WL 220408, at *5 (S.D.N.Y. Jan. 26, 2022); *Byrd v. Kijakazi*, No. 20-CV-4464 (JPO) (SLC), 2021 WL 5828021, at *22 (S.D.N.Y. Nov. 12, 2021), *adopted by* 2021 WL 5827636 (Dec. 7, 2021).  When an ALJ has to determine an RFC, his failure to request a functional assessment when no such assessment exists in the record or when any such assessments are insufficient constitutes a failure of his duty to develop the record.  *See Romero v. Comm'r of Soc. Sec.*, No. 18-CV-10248 (KHP), 2020 WL 3412936, at *13 (S.D.N.Y. June 22, 2020) (collecting cases); *see also Acosta Cuevas*, 2021 WL 363682, at *11 (applying same principle in post-treating physician rule context).  Moreover, despite the new regulations, an ALJ's duty to develop the record "takes on heightened importance with respect to a claimant's treating medical sources, because those sources 'are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from

the objective medical findings alone or from reports of individual examinations.'" *Id.* (quoting *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 216 (S.D.N.Y. 2017) (citing 20 C.F.R. § 416.927(c)(2))).

To satisfy the duty to develop the record, "an ALJ should have medical evidence from a medical source with a sufficiently persuasive opinion noting the existence and severity of a disability." *Id.* (citing *Marinez*, 269 F. Supp. 3d at 216). When an ALJ's RFC determination is questioned by a claimant, a reviewing court's "decision not to remand assumes that there are no obvious gaps in the record precluding the ALJ from properly assessing the claimant's residual functional capacity." *Newton v. Berryhill*, No. 18-CV-1244 (MPS), 2019 WL 4686594, at *2 (D. Conn. Sept. 26, 2019) (quoting *Downes v. Colvin*, No. 14-CV-7147 (JLC), 2015 WL 4481088, at *15 (S.D.N.Y. July 22, 2015)); *see also Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014) (ALJ required to seek out additional evidence when there are "obvious gaps" in administrative record).

The lack of a functional assessment from a source familiar with Jackson's physical impairments is an "obvious gap" in the record. As an initial matter, Jackson's claim that the ALJ "did not seek an opinion from [his] treating PCP Dr. George" is without merit. Pl. Mem. at 20.[20] The Commissioner correctly observes that Dr. George was sent requests for records on three occasions. Def. Mem. at 8.

---

[20] Jackson also argues that the ALJ did not "clarify any inconsistent statements in NP Amber Herman's opinion." *Id.* However, the ALJ was not required to do so in order to fully develop the record. *See Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) ("The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician.").

However, this outreach was insufficient for two reasons. First, Dr. George is not the only treating physician in a position to provide a functional assessment. The ALJ did not, on the record before the Court, reach out to Dr. Jindal, the neurologist who prescribed Jackson Neurontin and Hydrocodone for pain at a level of 8 out of 10. *Id.* at 588. Nor did he reach out to Dr. Ashraf, Jackson's rheumatologist who treated him for more than a year and a half, or CareMount, where Jackson was seen regularly by RPA Santana, Dr. Bui, and Dr. Cave for foot, knee, and shoulder impairments. [21]

Second, an ALJ's responsibility to make "every reasonable effort" to obtain evidence requires that the Social Security Administration "make an initial request for evidence from [a claimant's] medical source and, at any time between 10 and 20 calendar days after the initial request . . . make one follow-up request to obtain the medical evidence necessary to make a determination." *Starr*, 2022 WL 220408, at *5 (citing 20 C.F.R. §§ 404.1512(d)(1), 416.912(d)(1) (2017)); *accord Assenheimer v. Comm'r of Soc. Sec.*, No. 13-CV-8825 (ER) (SN), 2015 WL 5707164, at *15 (S.D.N.Y. Sept. 29, 2015)).[22] In this case, the ALJ sent requests for evidence to Orthopedic

---

[21] With respect to Jackson's mental impairments, the ALJ considered NP Herman's medical questionnaire. However, other health care providers also had long-term relationships with Jackson to support his mental health needs. Notably, Dr. Murphy's consultative examination notes referred to Jackson's ongoing medical treatment in which he saw psychotherapist Sophia Rhodes "once every two weeks" to address depression and anxiety, and nurse practitioner June Higgins "once every five weeks" for medication to address depression and anxiety. *Id.* at 451.

[22] "Indeed, the ALJ has the authority to subpoena medical evidence on behalf of a claimant, but, at the very least, must request the missing records through ordinary means." *Vellone*, 2021 WL 319354, at *7 (citing *Gonell De Abreu v. Colvin*, No. 16-CV-4892 (BMC), 2017 WL 1843103, at *5 (E.D.N.Y. May 2, 2017).

Associates (where Jackson was treated in 2017), Digestive Disease Center (where he was referred for GERD), Dr. George at HRHC, and Dr. Ashraf (at Premier Medical Group). AR at 520–23, 528–31, 524–27, 536–39, 532–35. However, he only sent follow-up requests to Orthopedic Associates and Dr. George at HRHC – but the record does not reflect follow-up requests to Dr. Ashraf. *Id.* at 544–46. While the ALJ sent three requests for evidence to Dr. George, it appears that only two included medical source statements, which were returned blank. Def. Mem. at 8, AR at 350–51, 411–13, 524. The first of those two was on May 22, 2017, prior to the application by Jackson in June 2018. *Id.* Moreover, the ALJ did not reach out to Dr. Ashraf for a functional assessment at all (as noted above), but rather only for medical records. *Id.* at 532–35.

Without the benefit of a functional assessment of Jackson's physical impairments after the amended alleged onset date, or any functional assessment of those impairments by a treating health care provider, the RFC is instead largely supported by the ALJ's own interpretation of the medical records and treatment notes in this case. *Id.* at 17–23. An ALJ commits legal error when, as here, he "fill[s] th[e] evidentiary void with his own medical judgment and interpretation of [the medical] records." *Lee v. Saul*, No. 19-CV-9451 (CS) (JCM), 2020 WL 5362619, at *17 (S.D.N.Y. Sept. 8, 2020) (collecting cases); *see also Dean C. v. Comm'r of Soc. Sec.*, No. 19-CV-1165 (DB), 2021 WL 1558501, at *8 (W.D.N.Y. Apr. 21, 2021) (ALJ not permitted to use own lay interpretation of record to develop claimant's physical RFC); *McGrath v. Comm'r of Soc. Sec.*, No. 20-CV-3042 (FB), 2021 WL 5281317, at *2 ("Because the ALJ is a layperson, not a doctor, she is not permitted to interpret raw

medical information into a determination about [the claimant's] medical condition without the assistance of a medical professional's insight.").

### 2.    The ALJ did not properly assess medical opinions under the new SSA regulations.

As discussed above, the new SSA regulations require an ALJ to consider a number of factors when evaluating the medical opinion evidence in the record – "most importantly, the 'supportability' and 'consistency' of each submitted opinion." *Velasquez*, 2021 WL 4392986, at \*25.  Courts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary.  *See id.* at \*27 (collecting cases).

The ALJ considered five medical source opinions in his decision.  AR at 23–24. These included: Dr. Murphy, psychological consultative examiner; Dr. Caruso, internal medicine consultative examiner; Dr. Hennessey, psychological consultant for the State agency; Dr. Auerbach, medical consultant for the state agency; and NP Herman, one of Jackson's mental health providers.  *Id.*

The new regulations require an ALJ to "specifically" explain "how well a medical source supports their own opinion(s) and how consistent a medical source/opinion is with the medical evidence as a whole."  *Acosta Cuevas*, 2021 WL 363682, at \*14.  It is not sufficient to cite to "some objective medical evidence in the record" and simply conclude that an opinion is "consistent with other evidence in the file" rendering it "persuasive."  *Id.*  In *Acosta,* the court ordered remand for failure to

properly assess medical evidence when the ALJ "failed to apply or even consider the

supportability factor." *Id.*  In that case,

> [n]owhere in the ALJ's decision [did] she explain, as the
> new regulations require, what the respective CEs' used to
> support their opinions and reach their ultimate conclusions
> . . . [i]nstead, the ALJ discussed some of the objective
> medical evidence in the record in comparison to the CEs'
> opinions to determine if the evidence and opinions were
> consistent, which is what the consistency, not
> supportability factors, calls for. Thus, the ALJ failed to
> apply or even consider the supportability factor.

*Id.*  The ALJ took the same approach here.

With respect to Dr. Murphy, the ALJ initially provided a summary of her

opinion and findings, and then he assessed her opinion as "persuasive as it is

internally consistent with Dr. Murphy's examination and it is consistent with other

findings throughout the record."  AR at 23.  However, the ALJ did not explain, as the

new regulations require, what Dr. Murphy used to support her opinion and reach her

ultimate conclusion, other than stating it is "internally consistent" (supportability).

Nor did the ALJ specifically compare other objective medical evidence in the record to

Dr. Murphy's (consistency).  In this assessment, the ALJ thus properly addressed

neither supportability nor consistency.

The same is true for how the ALJ assessed Dr. Caruso's October 11, 2018

opinion.  He provided a summary of Dr. Caruso's findings, and then reached the

conclusion that the opinion was "persuasive" as it was "consistent with the claimant

reports during the exam, the limitations are proportionate to the objective findings

from this exam, and they are consistent with the findings of other exams throughout

the longitudinal records."  *Id.* at 23.  He did not identify the specific objective findings

to which he referred.  The only piece of information from the examination to which he cited as a way of explanation is that Jackson "stated that he uses the assistive device to assist him mostly with his pain, not necessarily for ambulation." *Id.* at 23.  This explanation is erroneous.  A review of Dr. Caruso's opinion reveals that it does not convey that Jackson made such a statement during the examination. *Id.* at 455–61.  Further, even though Jackson reported "difficulty walking," Dr. Caruso declined to make a finding about Jackson's functional ability to do so. *Id.* at 458. As with his assessment of Dr. Murphy's opinion, the ALJ does not compare Dr. Caruso's opinion to other, specific evidence.

When considering Dr. Hennessey's non-examining source opinion, the ALJ described the findings and concluded simply that the assessment was "persuasive as it is consistent with and supported by the mental status examinations throughout the record."  He offered no direction as to which examinations.  Similarly, the ALJ found Dr. Auerbach's opinion "persuasive" despite Dr. Auerbach's conclusion that Jackson was capable of light work while the ALJ determined he was capable of sedentary work with exceptions. *Id.*  Nowhere did he explain the discrepancy.  Nor did the ALJ cite to any clear evidence in the record that offers support for Dr. Auerbach's opinion; instead, he noted his own personal assessment that Jackson has a "wide array of daily living activities and a high level of independence in his personal functioning." *Id.*  Neither of these assessments addresses consistency as required by the new regulations.

Finally, while the ALJ cited to specific treatment reports in considering the consistency of NP Herman's opinion, he stated in a conclusory manner only that "this

assessment is not well supported by [the treatment reports]." There is no mention of the findings contained within those reports. Similarly, the ALJ did not address the extent to which NP Herman's opinion is supported by her findings and treatment history. The Commissioner points out that "NP Herman consistently observed that [Jackson] was a good historian and had appropriate eye contact, cooperative and calm behaviour, spontaneous speech, focused thought form, intact concentration and memory, and good insight and judgment . . . [and] did not discourage [Jackson] from seeking out vocational training opportunities." Def Mem. at 30. The Commissioner also remarks, in a footnote, internal inconsistencies with NP Herman's report and the fact that it cites subjective reports as support. *Id.* at 30 n.12. However, such an assessment – and its relation to NP Herman's findings – was not included in the ALJ's determination.

Remand is appropriate when the ALJ failed to apply the correct legal standard, including adequately considering and applying the new regulatory factors. *See, e.g., Acosta Cuevas*, 2021 WL 363682, at *9 ("just as under the previous regulations when failure to fully consider the *Burgess* factors . . . would be grounds for remanding an ALJ's decision, an ALJ's failure to adequately consider and apply the new regulatory factors also require a reviewing court to remand."). Because the ALJ improperly assessed the medical evidence by not specifically addressing the supportability and consistency factors, the case must be remanded for further proceedings on this ground as well.[23]

---

[23] The Court declines to conclude, as Jackson has argued, whether the ALJ erroneously ignored the June 8, 2017 opinion of Dr. Gindes, a psychiatric consultative

3.      **The ALJ's RFC determination was not supported by substantial evidence.**

In addition, the ALJ's RFC determination was unsupported by substantial evidence in the record.  AR at 16–24.  Here, the ALJ found that Jackson could perform sedentary work with some modifications:  he could frequently reach with his left upper extremity, stoop and crouch; he should avoid working at unprotected heights; he could understand, remember, and carryout simple work, could adapt to routine workplace changes, and could occasionally interact with supervisors, co-workers, and the general public.  *Id.* at 16.

The existence of substantial evidence to support an RFC determination cannot be proven by an absence of limitations, but rather must be shown through evidence of what the claimant *can* do that meets the RFC asserted.  *See Rosa v. Callahan,* 168 F.3d 72, 80–82 (2d Cir. 1999).  "Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday."  *Ward v. Commissioner of Social Sec.*, No. 11-CV-6157 (PAE), 2014 WL 279509, at *13 n.18

---

examiner who found Jackson to be markedly limited in four functional categories, and extremely limited in one.  Pl. Mem. at 20; AR at 371–75.  *Id.*  As the Commissioner notes, an ALJ is "ordinarily" not required to consider evidence outside of the relevant time period.  *Carway v. Colvin,* No. 13-CV-2431 (SAS), 2014 WL 1998238, at *5 (S.D.N.Y. May 14, 2014); Def. Mem. at 29.  However, here, all of the other consultative examinations and both state agency non-examining opinions were also conducted prior to the accepted alleged onset date of December 28, 2018.  Nonetheless, despite falling outside the relevant time period, the ALJ decided to consider those opinions but not Dr. Gindes'.  "[S]ince the case is being remanded anyway, the ALJ should make clear the relevance of this evidence to his decision."  *Briscoe v. Astrue,* 892 F. Supp. 2d 567, 582 (S.D.N.Y. 2012) (evaluation not necessarily material when it predated alleged disability onset date by more than 18 months).  Any reconsideration of the alleged onset date upon remand, *see supra* n. 20, may impact the appropriateness of this evidence.

(S.D.N.Y. Jan. 24, 2014).  Thus, in order to perform sedentary work, a claimant must be able to sit for "extended periods of time," *Vellone*, 2021 WL 319354, at *10 (cleaned up), as well as stand or walk up to two hours of an eight-hour workday.

While the Commissioner correctly argues that a consultative opinion can constitute substantial evidence, Def. Mem. at 26, this case is different from *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108 (2d Cir. 2020).  In *Cook*, cited by the Commissioner, the ALJ properly relied on a consultative examination, State agency consultant opinion, and evidence treatment records when no other medical evidence in the record indicated that the claimant faced any limitations not reflected in the ALJ's RFC.  *Id.* at 109.  That is not the case here.  Here, the sole opinion with respect to Jackson's ability to stand, walk, or sit was from Dr. Auerbach, a non-examining consultant, AR at 101, and Jackson's medical records include some evidence that he may not be able to fully meet those standards.  Jackson testified that it was "real hard" to sit, "very hard" for him to go back and forth between standing and sitting, and that he couldn't sleep because of stiffness in his body when he would lie down.  AR at 62–63.  He described an hour as "way too long" for him to be standing or walking at one time.  *Id.* at 63.  Jackson reported to Dr. Jindal that prolonged sitting and standing aggravates his pain.  *Id.* at 587.  Even though Jackson reported "difficulty walking" during his consultative examination, Dr. Caruso did not assess Jackson's functional ability to do so.  *Id.* at 455–61.  The report of Dr. Auerbach, a non-examining consultant, was based solely on the record, which otherwise was devoid of evidence of Jackson's abilities.

"Because an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Vellone*, 2021 WL 2801138, at *2 (quoting *Donofrio v. Saul*, No. 18-CV-9968 (ER), 2020 WL 1487302, at *8 (S.D.N.Y. Mar. 27, 2020)). In *Rosa,* the Second Circuit found that the ALJ had mistakenly permitted the Commissioner to satisfy her burden of proof without requiring affirmative evidence demonstrating the claimant's RFC to meet the demands of sedentary work. *Rosa*, 168 F.3d at 80-81. So too here is the burden of proof not met, when none of the "persuasive" medical source opinions address Jackson's ability to sit, stand, or walk.

Moreover, Jackson is correct that because of the ALJ's failure to develop the record (as discussed above), the RFC determination is based upon an incomplete record. Pl. Mem. at 26. For these reasons, the RFC determination is not supported by substantial evidence, providing an additional basis for remand.

### 4. The ALJ's errors were not harmless.

Finally, the ALJ's failures to properly evaluate the medical evidence and develop the record were not harmless. First, NP Herman opined that Jackson's impairments would cause him to be absent from work "about three days per month." AR at 782. The VE testified that if a person was to be absent from work three days a month because of his or her impairments, one would not be able to maintain employment. *Id.* at 74. If the ALJ found NP Herman's opinion to be persuasive and

48

credited this assessment, he would have found there were no jobs in the national economy that Jackson could perform.[24]

Second, had the ALJ made all reasonable efforts to receive a medical source statement from Dr. Ashraf, he may have been able to consider Jackson's "worsening" arthritis in the hands, wrists, knees, and shoulders as of August 2019, for which Dr. Ashraf prescribed Relafen. *Id.* at 795–96. Moreover, while the Court has reserved judgment as to whether Dr. Gindes' psychiatric evaluation was improperly ignored, he had opined that Jackson had a number of marked, and one extreme, limitation. *Id.* at 373–75. If the ALJ considered this opinion and found it persuasive, he would have found Jackson's impairments satisfied the "paragraph B" criteria at step two of his analysis, thus finding Jackson disabled. *See Pines v. Comm'r of Soc. Sec.*, No. 13-CV-6850 (AJN) (FM), 2015 WL 872105, at *10 (S.D.N.Y. Mar. 2, 2015) (internal quotation marks and citation omitted) (ALJ's analysis of treating physician's opinion was not harmless error because VE "essentially testified that if these opinions were adopted, [the claimant] would be unable to work"), *adopted by* 2015 WL 1381524 (Mar. 25, 2015).

### III.   CONCLUSION

For the foregoing reasons, Jackson's motion is granted, the Commissioner's cross-motion is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g). On remand, the ALJ should (1) clarify the alleged onset date; (2)

---

[24] Jackson contends that the ALJ did not reconcile conflicts between his limitations and the requirements of the jobs assessed by the VE. Pl. Mem. at 25–26. The Court declines to address this argument given the other bases for remand discussed above.

develop the record with functional assessments from Jackson's treating physicians; (3) explicitly consider the supportability and consistency of the relevant medical opinions; and (4) as needed, reassess Jackson's RFC and the corresponding availability of jobs that exist in significant numbers in the national economy.

**SO ORDERED.**

Dated: March 3, 2022
   New York, New York

JAMES L. COTT
United States Magistrate Judge